The Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit. All right, be seated, please. We will proceed to the third case on the calendar for today, United States v. Walgreen. And we will hear from Mr. ... pronounce your name. Tataro, Your Honor. See how good I'm getting at that now? Perfect, Your Honor. Thank you, Mr. Tataro. Please proceed. Thank you. Martin Tataro on behalf of the United States. This is a False Claims Act case where Walgreen seeks to avoid liability for government payments it received based on fraudulent submissions filed by one of its pharmacists. These submissions involved conditions attached to very expensive drugs. A full treatment for a single patient for one of the drugs was almost $100,000. If Walgreen wanted to attack Virginia's prior authorization conditions, it should have done so before lying about complying with them. But it can't challenge the conditions as a defense in this False Claims Act action. If this Court reaches the merit ... That's the preliminary thing. Yes, Your Honor. I'll kick a few cogs out of my head on this case here. This action arises because a pharmacist who was working for Walgreen deliberately and now has settled fraudulently altered prescriptions. Well, Walgreen in its brief says allegedly, but yes, she was prosecuted for similar conduct. I'm going to assume she did. As I say, she did. And Walgreen kicks in the picture. They don't know anything about this employer that's doing this the whole time, employee who's doing this the whole time. But Walgreen is liable because, one, I guess it didn't pay back the money, which might be some sort of a reverse claim, or because of respondent superior. What is the ... And I know that's not ... It was just intriguing to me how we skipped to Walgreen. You are now violating the False Claims Act because you've got an employee who has done something that did it. Right, Your Honor. So Your Honor is correct with respect to the overpayment for the reverse false claim. And then the issue of ... I think it was litigated below on vicarious liability. She wasn't just a pharmacist. She was a pharmacist manager. But the District Court didn't decide the motion to dismiss. And here again we're on a motion to dismiss and instead decided it on its theory of the statutory scheme. And so presumably that might be an issue going forward. So that may still come up as to the liability of Walgreen under this. Did I say Walgreen? Yes, Your Honor. It's Walgreen. I believe that this court were to remand based on what the government says is a fundamental error in Section 1927 in Walgreen's interpretation. I believe Walgreen would not be foreclosed. Ultimately you're talking $800,000 or so. If they paid the $800,000, given the state of what we now know, that $800,000 should have been paid to Walgreen, but given the state now, would the government then give it back to Walgreen? You follow me? I don't think I do, Your Honor. Well, let's say we start out in cases against the employee and she's fraudulently and they say, well, you built us out of $800,000. You got more? And then Walgreen turns around and scribbles a check out and sends it to her for $800,000. And then it is determined that Virginia should have done this from the first instance. And these people should have gotten this, which I assume each one of those that didn't get it may have some kind of action or whatever. And Walgreen says, I just gave you $800,000 based upon you denying claims that you should not have played. Give me my money back. Would you give the money back? So the Walgreen or I'm sorry, the pharmacist did not pocket the $800,000. The $800,000 went to Walgreen. That's what I'm saying. Right. Pharmacist is out of it. I'm saying Walgreen pays it back. Walgreen pays it back to Virginia based upon what their pharmacist did. Then you find out Virginia did something illegal in denying this. Let's assume that happens. Do you then pay the $800,000 back to Walgreen? So first of all, there's also potential for trouble damages in a False Claims Act action. But just setting that aside for a moment, the core principle of the no collateral attack rule is that the underlying validity of Virginia's requirements are off the table. If Walgreen had wanted to challenge those conditions, they should have done it at the time. I'm only talking about now. Trouble damages all aside and all that stuff, you're dealing with False Claims Act. I'm talking about you pay something to Walgreen and you maintain that Walgreen got it and shouldn't have got it because they sent something false. But then it's ultimately determined Walgreen then gives it back to you, the $800,000. Then it's determined, well, you shouldn't have had those conditions that kept Walgreen from getting paid. My question is, does Virginia or the government then give Walgreen its money back? So I think it would depend on how the court decides to resolve this case. If the court said that Walgreen had to challenge those conditions at the time and cannot now offer an after-the-fact collateral attack, then Walgreen, that issue is just simply off the table. Off the table with respect to materiality, right? Off the table with respect to the entire False Claims Act claim. Including, I mean, I think I had the same question as Judge Wynn. If there really is no damage to the government because the government should have paid the claim all along, then don't they have a defense to any damage claim? They might, Your Honor, but that's not what they're arguing here. Well, not yet, but at some point they would. Just to build on that, I mean, this case is up here on materiality. Maybe there's an issue about that, maybe there's not. But the way the False Claims Act works, as I read it, you know it better, but it provides some statutory damages, some kind of fine-type damages or relief. And then it says damages. And why isn't the claim that you don't have any damages a claim about you're not being entitled to damages as opposed to what you call a collateral attack? If you're seeking damages, and here you are, I think, you're seeking the $800,000, they're saying, no, you don't have any damages, you don't have any loss, you've got, you know, wrongful, if you got that, it would be improper. Right. So if the court agreed with the government on our first argument, then the case would be remanded. On remand, Walgreen would not be able to contest the validity of Virginia's conditions. If Walgreen could otherwise somehow say that, well, you actually didn't sort of try to shoehorn it into a question of damages, then perhaps that's a possibility, which also suggests that this court could decide both our first argument and our second argument. You have a separate action. You go back and you collect $800,000 from Walgreen. Why come Walgreen can't then file an action that says, you owe me that money back, because that was illegal, that you just got this money for? So, again, I think it would depend on whether, well, first of all, this is extremely hypothetical because Walgreen has not paid us back. Because what you're saying is we need to go through these little technical steps here for the ultimate results of where, as Judge Qualibon indicates, they may not be any damages here. And so if there's no damages, then why would we be standing here? And how does Walgreen challenge those requirements? Walgreen, Your Honor, could have challenged the requirements before it decided to commit fraud. It could have filed a declaratory judgment action in federal or state court. We have this in the brief, and Walgreen did not contest it in their response brief. And at a bare minimum, Walgreen could have said, HHS, look at what Virginia's doing here. It's unlawful. A declaratory judgment action would, for what purpose? I mean, a declaratory judgment in terms of not on the False Claims Act, but on what? Right, this would be before Walgreen decided to commit fraud. It would be suing Virginia under 1331 and 1983, saying these coverage conditions are illegal. The court decided that. Let me just make facts. It's pretty clear Walgreen didn't know this employee was doing it. But I understand the vicarious liability, the whole bit. Walgreen doesn't know this, so it's just odd. I mean, you can have an employee, and it's got thousands of them. Each one of them do this. They've got to be responsible to the tune of a False Claims Act for every employee in there who files a false claim? No, Your Honor. This, again, goes to an issue that wasn't resolved, but was briefed by the parties on vicarious liability. The government's position wasn't that every single line employee at Walgreen would be liable. Managers. Managers. This is a manager, yes. Every manager they've got. They've probably got thousands of those. I don't know how many managers they have. I've got a bunch of them. Let's see, every one of them. This can happen if each one of them, at a certain level, if you've got any supervisory, every time they do something without the knowledge of the corporate, you know, in 1983-type actions, at least when we're dealing with municipalities and others and seeking this type of liability, Monell-type situation, you've got to show there's a policy or something that fosters this kind of behavior. And I don't know if vicarious liability carries that here, because it's not before us. But it's just interesting where we are today with this argument on this. I mean, I get it in terms of $800,000, but what makes this a different situation is the question of the legality of the conditions that were there placed on it that kept these people from getting these medicines. And, Your Honor, we agree that where we are today is a procedural anomaly, but that is because Walgreen chose to file a motion to dismiss rather than, for example, developing a record on the actual facts that these particular prior authorization conditions were unlawful. And so what they would have done, which is what plaintiffs have done in all the other cases they cite, is have a separate action where they say, what you are doing doesn't violate the prior authorization authority that allows, by the expressed terms of the statute, to subject, quote, any drug to prior authorization. They would have said, these conditions violate some federal or state provision. I don't mean to cut you off, but, I mean, I think we understand your collateral attack argument, and we'll agree with that or we won't. But let's talk about what I think you're getting into now is the merits of whether these conditions were or were not illegal. If they're illegal, maybe they should have challenged them separately. Maybe they go to whether you have damages. We can figure, maybe work on that later. But the core issue of whether it's proper for you to use the prior authorization statute to, you know, make sure that your argument hinges on the prior authorization provision alone. Is that right? Yes, Your Honor. Section 1927D1A. Okay. And so how do we square that with the Supreme Court statement in Walsh that, you know, that if once a drug manufacturer enters into a rebate agreement, the law requires the state to provide coverage for that drug under its plan unless the state complies with one of the exclusion or restriction provisions of the Medicaid Act? Yes, sir. And that's a case where prior authorization is being talked about. So how do we, how does that not put an end to your argument that you can look at the prior authorization section? So, Your Honor, D1A is a, so Section 1927D lists limitations on coverage of drugs. Right. And then D1 lists permissible restrictions. And it applies that restriction provision both to D1A, which is the prior authorization and D1B, which allows a state to exclude or restrict coverage of other outpatient drugs. What's the point then of B? I mean, doesn't that argument make B, you know, unnecessary? Because as you, if that's right, you know, prior authorization can be the basis for any substantive restriction. So what's the point of four specific substantive restrictions if there's a whole universe that could be covered? Two responses, Your Honor, a legal one and a practical one. The legal point is that prior authorization only allows a state to restrict coverage. It does not, in the grant in D1A, allow states to exclude coverage from a drug altogether. That separate authority is given in D1B. And so D1B is a greater authority because it allows a state to exclude coverage of a drug altogether. And the second point I was going to make was a practical one, which is that this is how prior authorization has been operating for three plus decades, and states have not abused their prior authorization authority in that way. And that's because of a very practical point. Imposing these prior authorization conditions are very costly. It bothers constituents. It's done under the specter of the federal government looking over your shoulder to make sure that these restrictions don't go too far. And it also ‑‑ And that may be, and look, I get the point. I get the point that, you know, you want to make sure the programs solve it. And at some level, if you don't have cost restrictions, you could have an issue. The question is whether the statute lets you make that determination. And in other parts that talk about medical treatment and medical services, there are provisions that kind of talk, that have language that the courts have interpreted may allow for a more cost‑based thing. But I didn't see that, you know, like, for example, I think AA19. You know, I've seen that provision. But you're not making that sort of argument. And I didn't see that sort of provision in the drug portion of them. So I'm just trying to see where you get the authority that you're doing this. Maybe it's being done for all these years. But that might have been wrong all these years. Your Honor, it's been done for all of these years, and Walgreen does not deny that. And to go back to your reference to the Walsh case, Walsh said what the 1990 Act was intended to do was codify, not limit, states' prior authorization authority. And one of the cases it cited as an example is the Cowan case from California that included prior authorization conditions that would, in Walgreen's view, be substantive and unlawful. So it's not just three‑plus decades of practice. It's also that the Supreme Court in Walsh said it was codifying that prior practice, too. So we're talking about generations of prior authorization conditions. And I would also just ‑‑ I'm well into my time for rebuttal, and I apologize. But if I can make one final point, there is a disconnect in Walgreen's theory. Walgreen first says there's no such thing as a procedural prior authorization condition. There's no restriction on that, in your Honor, under the plain text of 1927d. It's just talking about permissible restrictions. But on the other hand, they're saying, well, also there's this separate thing that medically necessary drugs also can't be subject to prior authorization. But the district court's opinion goes far broader than that medical necessity point, because there is a panoply, a full panoply of prior authorization conditions across the nation that are substantive under Walgreen's position and yet have nothing to do with medical necessity. So you've reserved a little time for rebuttal. And I understand Mr. Minot wants to speak for a period of time. Thank you, Judge Winn. May it please the Court, I'm Jordan Minot, Assistant Solicitor General here on behalf of the Commonwealth of Virginia. I'm joined by Eric Kamele, Deputy Solicitor General. My colleague from the Department of Justice discussed the merits of the False Claim Act issue, and the Commonwealth fully agrees with that position. As we noted in our reply brief, Walgreen, in its response brief, agreed with the Commonwealth that the standard for the state law claims is identical to that applied to the False Claims Act claims. I'd like to take a few minutes, however, to highlight that Walgreen's legal theory could have disastrous legal consequences for the administration of state Medicaid programs. As my colleague discussed, according to Walgreen, it may keep the money made on its behalf by the lives of one of its pharmacy managers to the government, so long as Walgreen's can, after the fact, convince the Court that some aspect of the Medicaid regulations with which it refused to comply were unlawful. That's true, according to Walgreen, even if the employee who lied and made money for the company spent substantial time in federal prison and could not avail herself of the same defense. Walgreen's legal theory also risks creating a sea change in the way that states administer their Medicaid programs. Typically, the government administrators of these Medicaid programs work collaboratively with doctors, pharmacies, and representatives of the private sector to dole out the limited resources that Virginia has available to cover its Medicaid patients. As part of that system, every state, including Virginia, has prior authorization requirements that don't necessarily map on identically to the subsection D-1B criteria. And that cooperative system, as my colleague pointed out, has functioned well for decades. That may be right, but isn't that a hole in the statute? Isn't that a problem for Congress? If your argument is that D-1A is broad enough to cover it, I hear that point, but it seems to me to make D-1B fairly useless in terms of its role there. And I get the point. I get the cost, I get that there's limited resources, and if Congress had said a provision that addresses that, we wouldn't have this issue. But the question is whether they did or not, and there's provisions in other parts of the Social Security Act that suggest they apply. I know I'm getting out of the Virginia statute, so it may be a little bit unfair. But when you talk about disastrous consequences, we don't like disastrous consequences, but we apply the law, not make policy decisions. Judge Qualbaum, I disagree that it's a problem for Congress, because I think Congress has already somewhat solved this problem. What Congress did in this scheme that it created was it gave states the flexibility to administer their prior authorization programs to meet the challenges of administering a state Medicaid program. The other provisions in the Act apply to other ways that states may control access to drugs, but the prior authorization scheme is meant to grant states that flexibility. And some of these concerns are not necessarily just cost-based. As we would have shown if this case progresses, at the time that these restrictions were in place, these drugs were brand new and sometimes hard to come by. So there's other concerns besides cost that may drive a state to have similar restrictions on its prior authorization scheme, and the scheme put in place by Congress explicitly gives states that flexibility. And I'll just touch briefly, as my colleague pointed out, Walgreen up front or one of its representatives or indeed anybody else who might have been affected by this could have sought a declaration in either state or federal court that the requirements were unlawful. Walgreen did not do that. Instead, when the government came to collect the money that had been taken from it fraudulently, Walgreen decided to raise the claim then. And the government should not be allowed to profit from that tactic. The Commonwealth asked this Court to reverse the decision below. Thank you. We will now hear from Mr. Phillips on the other side. Good morning. May it please the Court, I'm Jonathan Phillips of Gibson, Dunn & Crutcher on behalf of Appalachee Walgreens. Your Honors, the government brought this lawsuit to reclaim payments to Walgreens for curative, life-saving hepatitis C drugs that the Medicaid program was lawfully obligated to pay for in the first place. And the district court came to the common sense and legally correct conclusion that these, the Virginia's unlawful payment criteria could not have been material for purposes of the False Claims Act, and therefore the government has not pled an essential element of this case. The general principle that a law is presumed to be lawful until you make some determination that it is not. As the presumption of lawfulness doesn't apply here, that you don't just, every citizen, when you're dealing with something, you just don't go into civil disobedience or quit something because you don't like it without the consequences of whatever follows from it. But why does it not apply here? At least in terms of the initial False Claims Act, which then gets into, Judge Qualibon and I talked about damages. It seems to be an intriguing question to me. Yes, so what if you find it, but then you ultimately determine there's no damages. Or is that a separate question, the question of damages and whether one has been in violation of False Claims Act? In part it's a separate question, and in part I think there's a common thread to both of those things, which is materiality is an element of a False Claims Act cause of action. And the Supreme Court interpreted the materiality element in Escobar, and it said, it premised the idea of materiality on the legal option to pay or not to pay. It talks about the influence that information might have, that a representation might have on the recipient of that information's, quote, unquote, choice of action. Here, Virginia had no choice of action to not pay because the coverage criteria that it was using were unlawful. But isn't the question whether or not it would have actually influenced the decision maker, not in hindsight with full information? And in this case, clearly, had the Medicaid officials not been misled, they would not have paid the claim. So, I mean, isn't that the end of the story? I would say no, Your Honor. The statute begins, Section 1927 of the Medicaid Act begins with the idea that a state like Virginia that elects to cover prescription drugs for its beneficiaries must pay for any covered outpatient drug, which means that it is required to be dispensed on a prescription and that it is FDA approved. That is the starting point. Every drug that meets that description, and there's no dispute that the drugs here meet that description, must be covered. Now, if Virginia wants to peel away from that with limitations on coverage, there are ways they can do that that are enumerated in Subsection D, and specifically Subsection D-1B. And so to answer your question, Judge Diaz, the starting point for that government official who is deciding, do I have the option to pay or not to pay, the starting point is that they must cover the drug subscription that's here. I get that. I don't dispute that, but if they choose not to, mistakenly or otherwise, Escobar doesn't talk to that scenario. It just says, how do the facts actually influence the decision maker in this case? And in this case, the misrepresentations, wrongly or rightly, you say that they should have covered the drugs. They didn't, but they would not have but for the misrepresentations of your client and its manager. And it seems to me Escobar answers the question that that's material. The question of whether or not it's legitimate, as the other side says, is a question that they claim you can't now collaterally attack. You had options to do so beforehand and didn't. I think the Escobar court does not quite say, did the information actually influence the decision maker in question, which would be a causation issue. The question is, was there an ability for it to have affected the decision making? And that government official that you're thinking of, Judge Diaz, is commanded by the Medicaid Act to pay these claims. They are commanded to pay for a covered outpatient drug that is not subject to one of the recognized limitations under the federal statute. And as Judge Jones correctly ruled below, that means that the government is not able to establish a drug subscription. They can't establish materiality here. Both Judge Wynn and Judge Diaz's points kind of, it wasn't... I guess your point is, you should look at it and determine that it's illegal on your own. And so if you could look at it and determine it's illegal, you can't be material. It seems odd, though, because there was no declaration that it was illegal until it happened at the district court. So it's almost as you're getting a declaration that it's legal and is then like putting a time machine and goes back to the time they were making decisions and they say, we should have known it's illegal. I guess something could be so obviously illegal that meets that. But that's what's problematic to me, is we didn't know, arguably you didn't know it was illegal at the time the decisions were made. And as Judge Diaz says, it seems like it was relied on. And so, anyway, look, I think the legality of this presents concerns or problems in the damages section of the Medicaid Act. But I'm just not seeing it in the materiality context. Well, Your Honor, I would say, first of all, I don't think we do need a time machine to go back in time and say to the state at that time, these criteria were illegal. Because at the time, during the relevant time period, the federal government itself in Release 172 said, we do not think these specific criteria that you are using to exclude these drugs from broad swaths of patients are consistent with the federal requirement to cover outpatient drugs for which the manufacturer has entered into a rebate agreement and have been prescribed for a medically accepted indication. But we do not think does not make it illegal. That's true, Your Honor, and we're not asserting that that release, nor did the district court below, that that release invalidated the criteria as a matter of law. But what Judge Jones, I think, correctly found and reasoned was that it is certainly, when you read the statute for yourself, it's certainly consistent with that conclusion. And I was simply responding to Judge Quattlebaum's hypothetical, do we have to go back in time? And people were thinking about this that way at the time. But I think you would have to go back in time because didn't the release, didn't the scheme predate the publication of the release, the guidance that you're relying on? It, I would say, bookended it, Your Honor. That's a nice way of putting it. But either predated it or didn't. Which one is it? I believe the release came out in 2016, Your Honor, and the claims, the relevant type period of the claims in this case are 2015 to 2017. So you couldn't have relied on that. Your Honor, reliance, let me stress, reliance is not an element of the False Claims Act. No, I get that, but you brought it up, so it clearly can't be relevant if it didn't happen until after the fact. And the point I'm really trying to make at the end of the day is Escobar talks about the potential influence, not the actual influence, the potential influence on a decision maker's choice of action. And it cannot be, I think this is common sense, but it cannot be that a decision maker can make the choice to violate a law, can make the choice to violate a law. Can make the choice not to follow the command of the federal statute that governs the entire program. And in fact, that's the line, the Kaiser Steel line of cases that we cite that says the court will not enforce an unlawful payment term. The law will not compel what it has forbidden and denounced, which is the Koppel v. Hall case says that. And that may be, and illegality is a principle that is applicable in lots of areas of the law. Some federal places like we're talking about, it's contract law. I mean, it's all over the place, but I've never really heard it or seen it, even in doing work on this case, to be imposed on the materiality part of a fraud claim. Usually it's a separate theory that may be something that applies here. Like I said, maybe in the damage, I've just never seen it in this context. And so, yeah, maybe we've been wrong in where it falls all these years. But I've just never seen it in the materiality world. Well, I would hazard to say, Your Honor, that it's not common for the government to bring enforcement actions based on unlawful conditions. But if you do a common law fraud, you often come in the contractual world. I mean, yeah, I don't think I've ever seen illegality in that. I did private practice for a few years and dealt with fraud cases from time to time. And, yeah, I just, it seems to me it's an important concept and a relevant concept. I'm just, I'm struggling to see where, that it fits where we're talking about here. I think bringing the concept of an illegality defense that's talked about in Kaiser Steel in those cases, bringing that into the concept of materiality only strengthens its applicability. Because in those other lines of cases, we're talking about cases where the elements of the plaintiff's cause of action were satisfied. And we will nevertheless say that we are not going to enforce against the defendant because of some illegality. Here, as Judge Jones correctly found, you don't even get there because it's the government's burden to plead materiality under the False Claims Act. And you can't do that. The government has not done it here where the decision maker did not have a legal choice not to pay under the circumstances alleged. Can I ask a question about, just to get oriented a little bit, not about what the answers are to anything. There are certain claims that Walgreens provided false information. And there are certain claims about overpayment that hinge on their being not, that the money is not paid back. On the ones that involve overpayment, even if we were to disagree with the district court on materiality, do we still have to reach the illegality issue? Does that make sense? I'm not sure I completely follow that. In theory, we could say, hey, this illegality stuff is out there, but it doesn't have anything to do with materiality. And we could vacate on that basis. If we do that, what do we do? Do we still need to address whether or not the restrictions were illegal on appeal here? So I would agree with the first part of what you said, Judge, that you do not need to reach this concept of an illegality defense if you agree that materiality was not. I didn't mean to say it that way. I must have said it wrong. Assume we think illegality doesn't have anything to do with materiality. So that was wrong. I see. Then do we need to address the illegality for any other reasons on the appeal? As to the other claims in the case, the Non-False Claims Act claims, common law claims for overpayment, I think the parties have agreed that essentially those claims rise and fall with the conclusion on materiality, because the overlap is, did Walgreens receive money that it was not entitled to receive? That is the crux of a False Claims Act case. That's the crux of their common law overpayment claims. And we think, you know, for the reasons we've asserted with respect to the validity of the payment criteria, it's quite clear that not only were they entitled to receive it, the government was required to pay it. And I would say that, you know, this is another way in which materiality is expressed in Escobar, in the Fourth Circuit, and in other circuits. The question is asked, did the alleged misrepresentation go to the essence of the bargain? Did it go to the central purpose of the payment under this program? And I would submit that it goes to the essence of the bargain, that the Medicaid program pays for lifesaving medically necessary drugs that do not meet one of the limitations that are recognized in the statute. It is the essence of the bargain that when a doctor prescribes a lifesaving drug for a patient, and that drug is prescribed and claimed for payment by the Medicaid program, the essence of the bargain is that the Medicaid program pays for it, unless there's a specific reason they have said that they won't in the federal statute. So let's talk about the federal statute. You know, we have Supreme Court cases like, and these weren't cited, and they may not apply, that there's Alexander v. Choate, where the Supreme Court's talking about some of the provisions in the treatment and services realm of the Social Security Act. And they cite provisions that basically say that these provisions are for all the recipients. And that's been interpreted to say, hey, it's okay to draw some lines, even for medical necessary treatment that are medically prescribed. And that was Alexander v. Choate. Tennessee cut the amount of permitted stays in hospital from 20 days to 14, not because it wasn't medically necessary, but because they basically couldn't afford to stay afloat if they didn't do that. That's at least one of the things we're saying here. Now, I'll grant you, that's not a drug rebate thing. So maybe that's our difference. But is that concept not permitted in the drug world at all, that if the state says, look, we can't maintain our program because of these costs, that's not something we can take into account at all, that you have to fund it into bankruptcy? Your Honor, I think this part is the same with drugs and with services. The state absolutely can draw lines. And it can use prior authorizations to do that. But it cannot use the prior authorization process to say anybody on the other side of the line can under no circumstances get this drug. That is the problem. In Choate, they said under no circumstances can anyone stay more than 14 days, even if you need it. They just cut it off because they couldn't afford, they thought, to keep doing both. Why is this different? And that may be unfair because that's not in the briefs. Feel free to say, yeah, I hadn't read that in a while. I'm not trying to play gotcha with that. I'm just trying to get this concept of they've drawn this line that not on medical necessity, but on less medical necessity. And they say if we don't do stuff like this, we go bankrupt. That seems not irrational. Now, maybe it's not permitted, but it doesn't seem arbitrary or irrational. And I'm just trying to figure out, is there an arbitrary or rational standard, or did Congress just not leave room for that type of analysis? So I don't know the specific details of the payment rule in Alexander v. Choate, but I would bet that that rule said we will only pay for 14 days as the default. It still must, the program is required to in that situation, still allow a doctor to come in and say, but my patient needs 15 days and here's why. And that's what the prior authorization process is very good for. For doctors to say you may not want to pay for, let's say, fibrosis score F1 or F2, but my patient really needs it for lots of the reasons that Amici have covered extensively. And the problem with the Virginia criteria, especially as they've been alleged and applied in this case, is they completely cut out that possibility. And I think what may be short-circuited this discussion is I heard a moment ago the government say they don't contend that the prior authorization process can be used to exclude coverage of drugs, but that's exactly what they have alleged in the complaint. They have alleged that no patient with certain disease severity levels or history of substance use could ever, ever get these life-saving drugs. And that's the problem, because it lines up with the statutory text as well. There's the procedural restrictions that are asserted in D1A, that's the prior authorization process. And then there's the substantive restrictions, the exclusions on coverage, and it uses that word in D1B. And that's the list. That's the list of grounds on which you can exclude coverage. And Virginia did not comply with that. I would also say, you know, the government has alleged these sweeping consequences. You know, we won't be able to control our costs. States won't be able to use prior authorization anymore. There's been no evidence produced to support that. No amici have appeared to support that. And it's just not true. States will be free, if the court affirms, the district court below. States will be free to continue to use prior authorization for the reasons that it has been recognized are proper. In the Walsh case, in Concanon, in Thompson, in all the cases in the lower courts where they recognized, sure, you can use prior authorization, but you cannot use it in a way that completely excludes a patient from coverage of a drug, no matter what the doctor says. This is a side point, but maybe you can respond to this. So there was one misrepresentation that was sort of an outlier, and it had to do with one patient who was asked whether or not they could use a preferred alternative drug instead of the recommended drug. And the misrepresentation alleged was that she wasn't eligible, couldn't use it for a variety, I guess, of medical reasons. That turned out to be false. That has nothing to do with the requirements, either one of the two requirements in this case, prior authorization requirements. Why isn't that claim, at least, a legitimate claim? If I may respond, I see my time is up, Your Honor. I know the patient, example patient you're talking about, a judge, but the description, the government's theory of falsity of materiality in this case, as asserted in the rest of the complaint, is laser-focused on the failure to meet the fibrosis score and disease and sobriety levels. So they still assert that even in that example, the reason why that claim accrues false claims liability is no patient above a certain fibrosis score and no patient with a history of substance use could get the drug. And for the reasons we've asserted, those were improper, unauthorized criteria. Thank you, Mr. Phillips. Mr. Howard, you have a few minutes. Thank you, Your Honor. I'll be brief. I just have three brief points. First, to respond to Judge Quattlebaum's point. So all 50 states and the District of Columbia have opted into the Medicaid drug rebate program, which requires them to cover covered-up patient drugs unless an express exclusion applies. And so then Congress gave separate express exclusions as different types of authority. So A1A is the prior authorization authority, and that is very broad, but it is not limitless. Your Honor mentioned... ...a prior authorization condition that violates a different part of the Medicaid Act or some other federal law. And so Your Honor referenced A19 before, and that's the best interests provision. And that's the provision I suspect Walgreen would have invoked to try to invalidate Virginia's prior authorization conditions as going too far, as violating a different provision. And so the idea is a state has very broad prior authorization authority, but it can't go too far. The problem, however, is that A... What's the too far? Too far, I don't know what that means. Is it arbitrary and capriciousness? Or is there some statutory or regulatory description of what's too far? Sure. It's a statutory and a regulatory provision. In the Walsh case and in the Thompson case, it involved the statutory... ...and invoked the best interest provision. And so Walgreen, I assume, would have argued that the state... ...the care and services provided were not, quote, in the best interest of the recipient. So that's one substantive provision. The other substantive provision is from a regulation, 42 CFR 44230, which is the amount duration scope regulation. And that says a state can't violate the amount duration or scope if doing so arbitrarily denies or reduces coverage. But the core principle here, again, is that those are outside substantive conditions or limitations that apply. But A1 itself allows clear text of the statute, states to subject any covered outpatient drug to prior authorization. And so to your honor, again, to Judge Quattlebaum's point about how, well, does that render D1B superfluous? I don't think so. Exclusion, again, is a term of art. And it's also critical to point out that these were separate affirmative tools that Congress gave to states to allow for limitations... ...on what is otherwise very broad coverage of covered outpatient drugs. I would just refer to our reply on pages 14 to 15 where the D.C. Circuit addressed a similar issue where, well, aren't formularies. The formulary provision isn't that redundant or superfluous. And the D.C. Circuit said, no, these are separate tools, and Congress wrote the statute as it did, and we follow it. If I could just address my second point... Very briefly. I'll go to my third one then, your honor. There have been a lot of thorny, difficult statutory questions raised here today. This court could sidestep all of them if it agrees with our primary argument that Walgreen could not lie for years, collect reimbursements... ...and only now raise, many years after, for example, release 172, if it actually thought that release 172 said that these prior authorization conditions were illegal... ...and then challenge the validity. And so that would be one straightforward way to allow the court to dispose of the case and give the district court the opportunity to address on remand... ...difficult questions related to damages or what is left of the case after Walgreen cannot contest the validity. Unless the court has any further questions, we ask that the judgment be reversed. Thank you, Mr. Totaro. Thank you, Mr. Patak. Thank you, Mr. Phillips. We will come down and greet counsel and proceed to the final case of the day.
judges: James Andrew Wynn, Albert Diaz, A. Marvin Quattlebaum Jr.